appreciate the advocates appearing during a pandemic to help us out. And if any of you need a little extra time beyond what was scheduled, just let me know and I'll provide it to you. Now for the appellant, we've got Mr. DeStefano and for the appellees we've got Mr. Gar Margari and Mr. Boudros. So thank you all and I understand that the appellees are going to split their time. If the appellant wishes to make a rebuttal argument, do your best to stop before all your time's used up. Although I've probably revealed myself and the last argument is willing to give extension. So I know how that goes. Please proceed. Thank you, Your Honor. John DeStefano for the plaintiff's appellants and I would like to reserve five minutes of my time for rebuttal. The issue in this case is whether class-wide evidence that the defendants used an illegal deduction to undervalue and underpay total loss claims for 99% of class members satisfies the predominance requirement of Rule 23. Wait, Counselor, there was a lot loaded in that first statement. Is that in there that 99% of the putative class members were going to be underpaid here? It is, Your Honor. And I can turn to that immediately. First of all, we have full data from the class that enables us to identify who received a valuation containing the improper adjustment in the first place. And then plaintiffs conducted a sample of 200 claim files to establish what proportion of the class was paid based upon the valuations that were performed. And from that the claim payments. There were 1% of cases where the value... So what data point were you looking at? Only those where the deduction was applied? Because sometimes a deduction was not applied. In your position, those are not members of the putative class if the deduction was not applied? Correct. Yes. And we're able to identify those individuals from the valuation report data, which extends across the whole class. So, Counselor, so is it your position? Maybe I'm misinterpreting, but is it your position that there was a loss if, in your view, the deduction was applied, even if in the end, the insured got the number or more than the number they should have gotten if everything was done correctly? Are you including in that 99% people who may have been paid the right amount, even if at some point the deduction was applied? This gets to the fundamental point of the appeal, which is that the right amount is the amount that follows the method set forth by the statute. And that's consistent with the Steyer decision from the Washington Court of Appeals endorsing that approach. And it's consistent with the Johnson v. Hartford casualty case cited in the briefs and several others. But the point is that there's no free-floating inquiry into the fair market value of the class member's cars. The defendant is required to pay by following a calculation method that's laid down in the statute, which permits and disallows certain deductions to be made. So in your view, I understand your point, but you're including in the 99% people who may have actually received an amount equal to or greater than the actual cash value? No, because the actual cash value, and if you review the district court's summary judgment ruling at document 257, it followed this approach. The actual cash value that Liberty was to pay Plaintiff Laura and Plaintiff Lundquist under their policies is determined by the valuation procedure in Washington law, which was incorporated into the plaintiff's policies. And that procedure does not necessarily include a condition adjustment to comparable vehicles. What it says is in section 284, 3320 subsection three of the regulation, that deductions or additions to options, mileage, or condition may be made if they are itemized and appropriate in dollar amount, but only if they meet the precondition of being both itemized and appropriate in dollar amount, we would contend they flunk those requirements as well as others, such as the requirement that they be verifiable. But the purpose of this regulation was to ensure transparency and to ensure that the insurer was not placed in an unfair position relative to the types of deductions and additions that an insurer might try to make respecting their loss. They need to follow. My understanding was you've got this deduction part that goes on, but then if the insured doesn't like it, they can request an actual valuation. Am I misunderstanding that? The terminology that might be helpful is to distinguish between a valuation and an outside appraisal. Okay, so they can request an outside appraisal, which actually ended up being done for one of the plaintiffs here. And then he, I guess, refused to take the payment and instead chose to sue. But why doesn't that, if you want to call it escape hatch or whatever it is, why doesn't that ultimately solve the problem? Because if, I mean, it seems to me this is a way to estimate as best possible the value, the loss value. And if somebody disagrees with that, no one's disagreeing, you can go get an outside appraisal. And so if you disagree with that, go get an outside appraisal. And then that kicks it into a granular discussion. And just to correct the record, your honor, with respect to the plaintiff Lundquist's appraisal, that took place after he filed suit. He didn't reject the money before he filed suit. They were happy to pay him based on the appraisal. And that's also explained well in the district court's order on summary judgment, a document 257, when it rejected that point, he refused a settlement payment, which is not effective to move his claims under the Campbell school. But to get to your larger question, the appraisal option is not viable where the insured is not getting the valuation that they are entitled to in the first place. The premise of this process is that the insured was entitled to get a valuation that complied with the requirements of the statute. And they did not. And because of that, there was an informational asymmetry. There was a disadvantage where the insured wasn't even able to evaluate, was this $726 deduction appropriate or not? I have no other information about it. Was it because the engine is different? Was it because the seats are different? There's no way to understand. Appraisals aren't free and they come at the cost of the insured. They cost several hundred dollars. So to ask the insured to ante up is unfair in that situation, because you don't know whether the game is worth the candle. If you can't evaluate the legitimacy of what the insurer is doing in the first place. So it would defeat the entire purpose of this regulation to forgive all violations of the procedure of the calculation that's required to be used just because an insured is able to go out and obtain an appraisal elsewhere under the policy. That was not done for these class members. It wasn't done for either plaintiff before suit was in the study that we did. In addition, though, you can look at the testimony from Liberty Mutual's own people where they admit that adjusters don't determine the value. They don't put the numbers together that they rely on CCC to provide the value. So that deduction is baked in whatever other changes Liberty Mutual adjuster might make to the payment. It is never altering, correcting or removing that deduction when it's included in the valuation. They're stuck with it. They don't they don't revisit CCC's process. And there's extensive evidence on that at footnotes 24 to 26 of the opening brief. Let me let me ask you this. If a putative class member were paid the actual cash value of his or her car or more than that, would he still be able to class member who was paid based on the deduction, who was paid an amount reduced by that deduction, was paid the actual cash value of their car? As the Washington Court of Appeals stated in Steyer, there's an adequate measure of damages in the amount of the in this case, the condition deduction taken. That case was about a negotiation deduction, but a very similar principle. If the deduction isn't allowed, it doesn't follow the calculation that's required. And if that's true, if that's true, doesn't that mean that the harm is then a merits issue as opposed to a damages issue? Because you're saying this does go to the merits then of whether the deduction presents whether when the deduction is applied, it's a merits question of whether they're harmed. If CCC wants to present evidence that the that some plaintiffs weren't harmed by this deduction, which we've shown flows through to the ultimate claims payments, then it can do that on a class wide basis. And it's a complication of damages, which can be addressed at that stage under the question is whether it's a merits based if it's merits based, then it seems like this is every individual is going to be separately. The question of whether they're harmed is a question of I mean, I guess it's the threshold question of what you presented. Now you're saying 99% are harmed. I hadn't heard that before. So I'll have to go back and look at that. But but regardless, doesn't that mean it goes to the merits of the case. And so it's an individualized merits inquiry that you're asking us to do. And that seems to be exactly when class action should not be certified is when there's an individualized merits based determination. No, because we have class wide proof that on our theory of damage, just that the payment differed from the actual cash value, which was owed, which was the payment required by the calculation. Once you break the rules and apply a deduction, which is not allowed, you're paying something other than the calculation that's provided under the statute. And we can prove it, you can look at it two different ways. Either the calculation without the deduction is the contractual expectancy of the class. Or that calculation is evidence class wide of what the values are for the individual vehicles. But these defendants already did the individualized analysis, they already did the individualized valuations, we have the data, we have all of the assessments of those vehicles conditions across the class based on the you're saying that if this deduction was originally part of the calculus that this was a illegal and infected the entire determination of actual cash values such that even if at the end of the day, a class member got more than he or she would have gotten had the insurance company done nothing wrong, that that class member has still been damaged in the amount of the original quote unquote illegal deduction. Yes, because well, it because we disagree on the premise that the insurance companies in a position to have done nothing wrong, something wrong was done. But I'm but I'm but I'm saying that even if they had done nothing wrong, and the amount the client got was more than what would have been paid had they done it the right way, they're still damaged in the amount of the condition in the amount of the adjustment in your view, the illegal adjustment. They could have done any number of different valuations. And this is the key point, that the reason there is a specific stat regulatory method for calculating is because you could appraise a car in any number of ways. But the method that the class is entitled to is the method that the that the regulation prescribed and was implemented for them by Liberty Mutual. So they're entitled to the benefit of that expectancy, which is a valuation using the comparable vehicles supplied by CCC free of an illegal unsupported deduction, which flies in the face of the entire purpose of this regulation. If you revisit document 32, which is our briefing on the order to show cause at the outset of the case, it lays out all the purposes of statute in the legislative history, and the importance under Washington law of precluding any type of opaque and impenetrable deduction, such as this, because of the position that it puts consumers in and the risk they will be underpaid. The only number that they're entitled to pay is the number that's prescribed by the statute. And as long as that deduction is in there, they didn't receive it. There's no way for the insurance companies to go back and redo it because the cars are gone. The comparable vehicles are not in the same condition. So they're stuck with the data that we have, which is the elements of the valuation that were not challenging, free of the deduction, which violated the plain language of the statute and should not have been allowed to be used. And I'll reserve the remainder of my time for rebuttal if I could. Okay, let's, I'm going to add four minutes to Mr. Stefano's time for rebuttal. If you add four minutes to that, then I'll let Mr. Picari and Mr. Boutros each have 10 minutes instead of the stingy eight and seven that was brought for me to keep track of. Okay. Okay, let's proceed. Well, of the two appellees, who's arguing first? I am first, Your Honor. Gregory Garr on behalf of Appellee CCC Intelligent Solution. Thank you, Judge Gould, and may it please the court. Your Honor, the district court correctly found that this case cannot proceed as a class action because individual issues as to injury would predominate as to all others. The questioning on the first half of this argument, I think, has exposed the two central flaws in the plaintiff's position. The first is that to establish injury, you would have to have individualized assessment of the actual value of the lost vehicles, something you could not possibly do on a class-wide basis. And the second is, is that ultimately what plaintiffs are... Mr. Garr, can I ask you a question? What if this were a situation where they said, you know, if the, if the paint color is white, we're going to deduct $10,000 off the value of the car. Would that be, would that be susceptible to class action because, you know, at least for white cars where that deduction was applied, because it was just so, you know, you wouldn't actually have to do an individualized inquiry. Anyone would say that doesn't even make sense. I mean, is, is there a point at which the plaintiffs could have a putative class action here? Yes, and I, and I think that case would be much different, Your Honor, but what's different about this case is, number one, to show injury, they don't have to show that they painted my car the wrong color. They have to show that they actually received less than the actual cash vehicle of their car at the end of the settlement process. And the second is... Well, but in my, in my, in my hypothetical, anyone who had a white car, presumably it would be safe to say 100% of those in that category would have been harmed because that would have been just completely a non-starter. So they would have received less. And I guess I'm wondering how do you back that into here, into the case at hand? But there's an automatic reduction in Your Honor's hypothetical to $10,000 based on paint color. But it goes to the second point, Your Honor, which is that all of the condition adjustment is doing here is establishing the baseline for the meat of the valuation process, which follows, which is a component by component assessment of the wear and tear and condition of the vehicle. And that part of the process can and does completely offset the initial condition adjustments. So that, so just to back up a second, I mean, what the condition adjustment does is CCC goes out and has a database of millions of comparable, millions of cars sitting on dealer lots, and they look to find cars with the same make and model. And then we'll start with that vehicle. And then, but then they'll say the average car on the road is not driving around in dealer ready condition. It's driving around in normal wear. And so we're going to adjust for that to be able to establish a baseline of normal wear from which we can begin to make an apples to apples comparison with the lost vehicle. And at that point, what we're going to do is engage in a 12-step individualized component by component process to determine the condition of that vehicle. And if the condition of the lost vehicle was in fact in dealer ready condition, then we're going to go up at that point with respect to that component. And we're going to go across all 12 components. And if you look at the evaluation report and the, in the record, your honor, at 33101, your honor, you'll, you'll find the, an example of an adjustment that you have $490, $495 condition adjustment going up. And then when you go through the component by component adjusted adjustment, you have a complete offset of that condition adjustment. That's all I want to, I want to switch focus here for a minute. Would you agree that the district court got its interpretation of 284-30-320 per M3 wrong? I think your honor that, that the regulations don't require establishing both an itemized deduction and an appropriate. So your, your answer to my question is yes. Well, it would have been yes, your honor, except that I don't think that that's the right way to understand what the district court did. I think actually what the district court said is in essence, exactly what we briefed to it below and what we're saying here, which is that it's not enough to show an itemized deduction. You've got to show at the end of the day that that resulted in an amount that's less. Well, I did read the district court saying that, but it sure looked to me like the district court was interpreting the statute to or the regulation to say that you need to show that they're both not itemized and not appropriate as opposed to what I would consider to be the more obvious reading of the rec. Go ahead. I was going to say, I mean, if that's the way you read the court's opinion, then you should say that, but you should say that ultimately the district court was exactly right when he said no harm, no foul. And here it's not enough to show an un-itemized deduction. Of course, we don't think they've shown a violation, but even if you posit that you've got to show in order to establish injury, which is a separate element of the cause of action that they brought under the consumer protection act and breach of contract law. And in order to show that injury, you have to show that the amount that they received at the end of the process was less than the actual cash value. Part of your argument here is the district court didn't abuse its discretion, right? Correct. Absolutely. And I'm sorry, Judge. No, I'm good. When Judge Bennett just concluded his question, then I have a question. Oh, please go ahead, Judge Gould. Well, this is probably a question way out in left field, but I'd like Mr. Carr to respond and Mr. Boutros could also think about it. It strikes me that I don't see how individuals who have a car damaged on an individual basis could have resources sufficient to do battle with an insurance carrier that handles hundreds of thousands of such cases, which was that concern was leading me to wonder whether it could be said that there's injury to all class members who are denied a fair procedure to evaluate their car's value on its total. And that that's the injury common to the class and that whether they're damaged or not, that is an individual determination on the amount of Supreme Court's Article III requirements of injury. I just want counsel to give me their view on that idea. Right, Your Honor. And I guess I would say first, that wouldn't fly into the Washington Consumer Protection Act because established injury under that act, you have to show injury to your business or property. And I don't think a generalized procedural injury or perception of it would qualify as that. And then I would go exactly to what you alluded to, which is the Supreme Court's decision in the transunion case that a bare procedural violation or formatting violation in that case would not be a concrete injury for purposes of Article III. And I think that that principle applies to the claims in this case. And I also think it establishes an appropriate benchmark for the same conclusion under Washington Consumer Protection Act and contract law. And ultimately, that's not what this case was about. They're claiming a breach of a contract that entitles them to the actual cash value of their lost vehicle or in essence, the replacement value. And that's what we're talking about, the fair market value of the vehicle. That doesn't have anything to do with procedural violations about the regulations. Their claims are not under the Washington insurance regulations. Those regulations are not privately enforceable. The Washington Insurance Commissioner not only has not found a violation with respect to any of the valuation practices here, in fact, it's letters. And I'd point you to ECF number 293-2 at page 12, point you to the opposite conclusion that they have found no violations, Your Honor. So I think Your Honor's question is entirely hypothetical. If I could address the 99% figure, Your Honor, that figure, which appears at ER 5679, that's plaintiff's figure for the percent of people who have been subjected to the condition adjustment. But that in no way is equal to those who have suffered injury. It has absolutely no relation to those who received an amount that was less than the actual cash value of their vehicle. So that tells you nothing about injury. Again, what they're seeking in this case is a windfall. They want the amount of their vehicle plus the condition adjustment, which would mean that if you had a vehicle that it turned out was in dealer-ready condition, you'd get that value. And then you'd get the condition adjustment on top of that, giving them more than that. So just to close off that line, if though, 99% of the time when the adjustment was applied, it did show a devaluation and a harm, would that be enough to certify the class? I don't think so, Your Honor. But I mean, I think what's missing there is we don't know what the percentage is until we've done that determination in thousands of cases, which is going to require thousands. Right. And here it was only based on a sampling of 200 or whatever. Exactly. And that's why that's why this case is exactly similar to the Van Tassel case decided by this court. It's an unpublished disposition, but it's on all fours in terms of why predominance was not met. And we pointed to other cases in our brief. Just on the issue of actual cash value, actual cash value is fair market value. That's how the Washington regulations themselves define it. If you look at WAC 284-30-320, and it's a commonly used phrase and term in industry practice, it means the fair market value or replacement value of the car. It's not the case, as my friend Mr. DeCifano has hypothesized, that it only means if the process is followed under Washington insurance regulations. What they've alleged is a procedural violation of the regulations as to whether or not an amount was itemized or not. That's a classic, bare procedural, technical formatting type violation that in itself would not establish an Article 3 harm. It doesn't establish a harm under the Washington Consumer Protection Act, doesn't establish a harm under contract law, and you cannot determine whether there's actually been injury, which goes to the question of liability or not, without conducting an individualized assessment as to each vehicle and as to each settlement process. Thank you, your honors. Okay, Mr. Boutros. Thank you, Judge Gould. May it please the court, Theodore Boutros on behalf of Liberty Insurers. I'm going to answer, Judge Gould, your question, but first just to put it in context why the district court got it right in denying class certification. Liberty uses an elaborate, reasonable, fact-intensive approach to determining actual cash value, and as Mr. Garr said, that's the fair market value. It's not some abstract notion of what the statute says. These are breach of contract and consumer protection claims, and the company's procedure includes adjuster inspections of the lost vehicle in a detailed report that they then give to CCC, which then conducts its analysis based on a massive database nationwide, and then targets the locale where the lost vehicle is located. They use factors like the condition of the loss in comparable vehicles that are expressly allowed by Washington law. The statute and regulations say condition is a factor in determining comparability, and then once the report from CCC comes back, and talk about explanation, they're like 15 pages. Laura's, for example, Plaintiff Laura's is at ER 3224 and goes on for 15 pages. That goes back to the inspector, and then the inspector, or excuse me, the adjuster, the adjuster can then make any determination he or she wants based on the report or other information. No, they can't throw out the condition adjustment, but they can look at other sources of information, give a goodwill adjustment. They have enormous discretion. So is, Mr. Putras, so is, in your view, the definition in 2843323 of comparable motor vehicle, which talks about deductions, for example, could be made if they are itemized and appropriate. Is that, in your view, and part, is that irrelevant? Whether or not the, if this was factored in, whether or not the insured was told what the deduction was, and it was separately itemized, does that not matter? I don't think it matters here, Your Honor, because they never connect that up with any actual injury or any loss. And I would say, though, Judge Bennett, what I really wanted to make, it is explained. If you want to look at page 3230, this is, you know, I think it's an important contextual point of Ms. Lara's report. It says that the bottom of that blue box, the condition adjustment sets the comparable vehicles to normal wear condition, which the lost vehicle is also compared to in the vehicle condition section. And then on the next page with comparable vehicles, it lists the amount. So it's explaining that there's an overarching adjustment. But as Mr. Gar said, then the process goes into detail and lists out every adjustment on the lost vehicle, increasing them as appropriate to dealer ready. So it's all in there. And that just really just to kind of set the benchmark. And the Washington insurance regulators who have rejected these exact claims, including Ms. Lara's claim. So that leaves Mr. DeStefano to make this hyper technical argument about itemization, the kind of formatting claim that was made in TransUnion that the Supreme Court said did not give Article 3 standing. And it certainly doesn't create injury for all the reasons Your Honors were pressing Mr. DeStefano. As we're looking, as we're trying to look at analogies, is this analogized to the product liability context where like you may take a drug. I mean, if you take a drug, say there's a certain percentage that are harmed, but you still have to show that you're within that category of those that are harmed. I mean, I think no one's denying. Well, maybe you are. But in certain cases, this is undervalued. This will undervalue in certain cases. But at the end of the day, the plaintiff still has the duty to show that they're in that. Just like if you took a drug, and we know that 15% of those people who take the drug are going to be injured, you still have to show that you're one of those 15% who are injured. Is that the right analogy? Or am I overstating? It's closer on here. But I think our case is even stronger, because they're not arguing that the actual value, that the estimate itself is defective, to use your analogy. They're saying that the way it was either described or itemized, this procedural, so it's one step even beyond that. But yes, our point is to- Well, I understand their argument to be, at least as I heard it, that they're claiming, whether they're right or not, 99% are devalued. But that's exacerbated by the fact that they don't even have the information in front of them to tell where they're devalued. And again, there's no evidence classified that anybody thinks that. And in fact, here, the two named plaintiffs, this goes to our typicality argument, their claims don't even depend on the CCC reports, because one got an appraisal through the appraisal process, the other one relied on her own appraisals and own information. So they're actually making arguments that people like them should be thrown out of the class. It just makes no sense. But the point to go, now there's a long segue to go to Judge Gould's question, the- No one's claiming that this process is so unfair and difficult that insurers aren't getting enough information writ large. But the bottom line is there's another alternative, the appraisal process, which is specifically authorized in the regulations. It's in the insurance contracts. The Washington courts have said it's fast, speedy. Remember, this is like, you make an insurance claim, you want to get your money, you don't want your premiums to go up because the process is so expensive. And so the statutes and the regulations in Washington allow for statistical analysis and this comparability analysis. So there's just no evidence that anyone got less than they bargained for in their insurance contracts, the fair market value of their vehicles. There just isn't. And there's no proof that that could be shown on a classified basis because it's super individualized as to the lost vehicle and as to the comparable vehicles. So there was no predominance. The other fundamental problem I wanted to focus on briefly is with respect to the Comcast piece of this. That creates another fundamental predominance problem. As this court knows, Comcast held that as to damages and class-wide damages, the plaintiff doesn't have to prove the exact amount and that doesn't necessarily defeat class certification if damages present some individualized issues. But what the plaintiffs have to do is come forth with a model of class-wide damages calculation that matches up with their theories of liability. And this court in the Winn v. Nissan and the Pulaski case walked through this and said, we look to see what the claims are and what the available remedies are. And then the question is, does the model for classified damages provide a way to calculate those sorts of damages? It can't be any abstract. It can't be something disconnected from the causes of action. And here, both causes of action, the breach of contract and the consumer claim, the measure of damage is actual compensatory damages. And here that would be, let's just assume everyone got less than they were entitled to. They didn't get cash value. The question would be, how much less did they get? But that's not the damages model that Mr. DiStefano just outlined. And it's not what they presented to the district court. And that's why the district court found lack of predominance based on the damages model. Their model is a penalty. It's a punishment. It's, you used on one page, the condition adjustment, and they ignore what happens on the other pages where the netting effect happens as to the loss vehicle. And they just say, boom, automatic penalty, a punishment, as Mr. Carr said, a windfall. It's not authorized by Washington law. It's not authorized as a breach of contract remedy. You can't get punitive damages. And it's not authorized under the Consumer Protection Act. So they fail Comcast. It's even more egregious than in Comcast because there's a complete mismatch and disconnect between the remedies available and the claims they are asserting, breach of contract and consumer protection, and the damages model, which is completely unsupported by Washington law in multiple respects. It's a crude, punitive model that ignores what's actually happening in the valuation process. And Mr. DiStefano suggested that the adjusters are hamstrung, that they can't depart from the CCC reports. What he's really saying is there was testimony, but they can't readjust it. They take the report, but they take it for whatever they think it's worth. If there are other factors, other information, if they want to make a goodwill adjustment upward, they can do that, which again is highly individualized. And I'll finish with the superiority. And this ties us back to Judge Gould's question. The appraisal method is vastly superior. It's speedy. It gets money in the pocket of the insured quickly. It's an independent appraisal. It's efficient. It's not expensive. It's easy to take advantage of. Although the vast majority of insureds, when faced with the choice of going through an appraisal process and just taking the check, are I think, if not the vast majority, a large number are just going to take the check because they don't want to fight the it strikes me as there's some hyperbole there and vastly superior given the bargaining power and resources. And I didn't want to overstay your honor. I hear that. But here, because of the individualized issues, there's no indication that most people were unhappy with the amount they were getting as an offer. And as the record reflects, there's negotiation with respect to both of these the adjuster kept increasing the amount. So there is a give and take. And again, I respectfully submit there's the allegation here isn't that the process itself is producing estimates that are below cash value. It's this hyper technical procedural type of formatting allegation that the Supreme Court in TransUnion said doesn't even give Article 3 standing, let alone constitute the kind of injury that would qualify under Washington law as actual injury. Thank you very much. Thank you, Mr. Vitros. We'll go back to Mr. DiStefano. You're muted, Mr. DiStefano. You're muted. My apologies. Just to correct the last point. The both plaintiffs were paid despite any evaluation reports containing the adjustment and the facts supporting that are in the reply at page 29, but also in the court's summary judgment order. That part is not in dispute. But I want to point the court to section 284-3391-2b, which says the insurer must determine the actual cash value of the lost vehicle by using any one more or more of the following methods. And it lists the methods that are available. And there's not a free flowing option to do it another way. The insurer can't breach the requirements and then come to court and insist that damages be proven in another way, just like in the Johnson case. Just like in the Johnson case, the court held that fundamentally. Counsel, my concern is, and maybe I've got it backwards, but it's more the liability portion of it. I mean, I don't, I think you've got to show liability first. I mean, I'm actually more comfortable with the damages portion of it, but the liability is what seems so individualized here, where we don't know. I mean, every individual has to show that they're harmed. So why doesn't that just make it an, I mean, how does that not make this no transunion? The court actually stated, is that what you're standing on? Is that what you're standing on is the failure to itemize? Are you saying, I mean, I understand that argument, but at the end of the day, the question is, were they paid fair market value? And I don't understand how that is not an individualized inquiry. No, the end of the day, the question is, were they paid the calculation they were entitled to under the regulation? That's the ultimately, ultimately, the question is, did they get fair market value for their car? No, there's no other way to calculate it other than what the, what the insurance companies required to do by regulation. And if you, the Johnson case says the injury suffered under, under your theory, under your theory, if they were paid more than the value of their car, they'd still be harmed. Because there was no, there was no disclosure of the adjustments. There is no other counterintuitive, there's no other value to use. The Johnson case says, for example, in an analogous issue about depreciating a property claim, the injury suffered by Johnson is determined by Hartford's alleged failure to calculate his ACB claim in accordance with section 2051. That's not a total loss. So you're telling me you're, you're telling me that a plan, one of the class members, putative class members who comes in and says, you calculated this wrong, I'm harmed. And it turns out they go through the calculation that you demand. And then the insurance company says, oh, our bad, give us $1,000 back. That doesn't make sense to me. I mean, they have, it has to still go to that they received less money than they should have by the fair market value. And if the insurance company overpaid them, because this calculation got the wrong numbers, there's no harm in the fact that they didn't have the disclosure. They got more money than they were entitled to. This deduction is unlawful because of more than just the lack of itemization. It's also not verifiable. It's based on a database where 90% of the vehicles are not inspected. There's no individualized assessment of the condition of these comparable vehicles. So there's a substantive problem right there with a deduction, which is identical within a given report for all the comparable vehicles within the report. It's not based on any individual facts about those vehicles. It is, it is an invented number that applies just to reduce their values and shortchange the insured without giving them all the information that they are entitled to. The comparable vehicles aren't inspected. Liberty doesn't inspect them. Liberty doesn't check up on this process, make sure the same standards are applied to those dealer vehicles. And so what you're left with is the remainder of the process, the remainder of the calculation that plaintiffs are not challenging, which is the best evidence that we have of, for every individual in the class, what the value actually was when computed in accordance with the statute. And I do want to touch on this idea of an offset that was alluded to by counsel. First of all, any offset that arises from another adjustment in the same report is a complication of damages that should be addressed after class certification, but it's a meritless point regardless. They're talking about adjustments made for the condition of the lost vehicle, which are calculated and applied and assessed independently of the comparable vehicles. So if the lost vehicle is rated excellent, the same condition adjustment applies to the dealer vehicles. If the lost vehicle is rated as terrible, the same condition adjustment applies to the dealer vehicles. So there is no offset. That argument is a red herring in any event, even if it did reduce the damages, we have class-wide data on what those adjustments are and I want to emphasize too that it is the insurer's duty to follow the regulation and calculate accurately under 284-30-380 subsection 7. And it is the failure to do that, that can't be foisted back on the insured. So as to say the insurer's duty now is to go and find out what these cars were really worth. All we've got is the calculation that's required by the law and the calculation wasn't done by the insurance company. They had their chance. They had their chance and what they owe is what was determined to be the value without this deduction, whether it was because of the color of the paint, whether it was a number that had nothing to do with the comparable vehicles on the individual report, which is what happened. The insureds are entitled to either prove their case by recovering that expected payment, which would have occurred, but for the deduction, or to show what the values of the vehicles were class-wide using CCC's own evidence. CCC is in a very poor position to disavow what they already did and claim the rest of the valuation isn't effective when they've gone ahead and applied an extra step, an extra step which never should have been taken. The sampling approach is approved under Tyson Foods by the Supreme Court and under plaintiff's theory of damages measured as the compliant and the non-compliant evaluation, the theory of liability matches up exactly with the theory of damages. Counsel, I apologize for interrupting, but you're already almost a minute and a half over the already extended time. Understood. And I was about to say, if there are no further questions from the court, I will submit. They will. Let's see, I have no questions, but Judge Nelson, Judge Bennett, questions? There are no questions. Therefore, I'm going to thank all the advocates for helping us out today. And for those of us who at one time practiced law, it's wonderful to see such excellent advocacy on both sides of the case. Without further discussion, we will submit this case, Lara versus First National Insurance Company, and the advocates will hear from us in due course. So thank you again. Court will now take a 10-minute recess before proceeding with Milky. This court stands in recess for 10 minutes.
judges: GOULD, BENNETT, NELSON